

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00267-CV

_____

IN THE INTEREST OF G.F., A CHILD

---

On Appeal from the 16th District Court
Denton County, Texas
Trial Court No. 19-4964-367

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

Mother—the only parent to challenge this judgment terminating parent–child relationships—claims that the Department of Family and Protective Services failed to prove that she endangered her daughter Susan[1] and that termination is in Susan's best interest. Mother contends primarily that the evidence supporting the Department's reason for removing Susan from her custody—suspected Munchausen's by proxy[2]—shows nothing more than that she appropriately sought care for Susan's behavioral and mental-health problems, leaving her in a safe place, and that Mother—perhaps wrongfully—skeptically questioned and criticized the provided care. But the Department's evidence at trial showed much more: Mother's long-term alcoholism and drug use in the face of chronic mental-health issues—which contributed to Mother's criminal history and an unstable and chaotic home life for Susan—along with Mother's denial of and inability to effectively manage Susan's unique mental-health and behavioral needs, endangered Susan. Accordingly, we affirm.

## A. Brief background

The Department removed Susan from Mother's care after Child Protective Services, a Department division, received a referral for "neglectful supervision,

---

[1] We use a pseudonym to refer to the child. *See* Tex. R. App. P. 9.8(b)(2).

[2] Munchausen syndrome by proxy, also known as pediatric-condition-falsification disorder, is a form of medical child abuse. *See, e.g.*, *In re A.G.K.*, No. 04-16-00315-CV, 2016 WL 6775590, at *4 (Tex. App.—San Antonio Nov. 16, 2016, no pet.) (mem. op.).

specifically Munchausen by proxy." At the time, Susan had been an inpatient at a Houston children's hospital for a little over three months. Although Susan's treating neuropsychiatrist had initiated the referral within two weeks after her admission, the Department did not file its removal petition until the hospital threatened to discharge Susan because of Mother's behavior.

In the nine months before her admission to the Houston hospital, eight-year-old Susan had been hospitalized seven times, and had participated in two hospital outpatient programs, for mental-health and behavioral issues. During that time and before, Susan and Mother had lived in various places: in housing for single mothers, at Safe Haven, in a home with Mother's friend, in an apartment, and off and on with Susan's maternal grandmother.

Susan's neuropsychiatrist was concerned that although Mother had attributed Susan's psychiatric symptoms to a five-year-old traumatic brain injury, he did not believe that Susan's behavioral problems arose from that injury; rather, he believed that her problems resulted from Mother's inability to effectively parent Susan with her unique mental-health needs. Additionally, because the hospital staff noted that Mother's speech was sometimes slurred and that she had behaved erratically, they were concerned that Mother might have been taking Susan's prescribed medication.

Mother refused to talk to CPS about the referral, but she told the caseworker during the investigation that "all the medication that [Susan] ha[d] been put on in the past" and "all of the hospital stays" had "not helped her at all." In the removal-

petition affidavit, the caseworker opined that Mother had subjected Susan to unnecessary medical care, was "using [Susan's] health as a way to get her needs met," and was "again abusing substances" and engaging in erratic behavior.

After the trial court awarded the Department temporary managing conservatorship, the parties agreed to a temporary order under which Mother agreed to "refrain from all criminal activity," "from alcohol use and/or consumption," and "from the misuse of prescription medication." The trial court also ordered Mother to "inform the Department of any use of alcohol, illegal substances[,] and prescriptions."

After Susan's discharge from the children's hospital, she lived with her maternal grandfather and his wife for almost a year and a half. She was not hospitalized during that time.

But Maternal Grandfather could no longer care for Susan after December 2020. So Susan went to live with her former stepfather, his wife, and Susan's half-sister—Stepfather's child with Mother. After a little over a month, Susan ended up back in the hospital because she had attempted to choke and threatened to kill her younger sister. The hospital released Susan after about a week, and CPS placed her in a therapeutic foster home.

After four extensions of the suit's dismissal deadline,[3] the Department tried the case to the court, who not only heard from several witnesses but also admitted into

---

[3]The parties agreed to the first six-month extension before the one-year anniversary of the trial court's first temporary order appointing the Department

4

evidence voluminous medical records for Susan and Mother. The trial court found that Mother had placed Susan in or allowed her to remain in endangering conditions or surroundings, that Mother had endangered Susan or knowingly placed her with people who endangered her, and that Mother had failed to comply with a court order setting the conditions for Susan's return to her custody. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O).[4] The trial court further found that terminating Mother and Susan's parent–child relationship was in Susan's best interest. *Id.* § 161.001(b)(2).

On appeal, Mother claims that the Department failed to prove the Section 161.001 termination elements. Although she does not specify the sufficiency-challenge type, she asks alternatively for rendition and remand. We will therefore review the evidentiary sufficiency under both legal- and factual-sufficiency standards. *See In re D.S.W.*, No. 10-10-00108-CV, 2010 WL 5419014, at *1 n.1 (Tex. App.—Waco Dec. 29, 2010, no pet.) (mem. op.).

---

Susan's managing conservator, and the trial court signed each remaining extension order before the previously extended date and within the extension date provided in the then-effective Texas Supreme Court's COVID-19 emergency orders. *See* Tex. Fam. Code Ann. § 263.401(a), (b); Thirty-sixth Emergency Order Regarding the COVID-19 State of Disaster, Misc. Docket No. 21-9026 (Tex. Mar. 5, 2021); Thirty-third Emergency Order Regarding the COVID-19 State of Disaster, Misc. Docket No. 21-9004 (Tex. Jan. 14, 2021); Twenty-ninth Emergency Order Regarding the COVID-19 State of Disaster, Misc. Docket No. 20-9135 (Tex. Nov. 11, 2020).

[4]Father voluntarily signed an affidavit of relinquishment. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K).

## B. Applicable law and standard of review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012).

Here, the trial court found under (b)(1) that Mother had endangered Susan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E).[5] To "endanger" a child means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.) (citing, e.g., *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)).

Under Subsection 161.001(b)(1)(D), we examine evidence about the child's environment to determine if the environment caused the physical or emotional endangerment. *In re T.R.*, No. 02-20-00359-CV, 2021 WL 1421423, at *3 (Tex. App.—Fort Worth Apr. 15, 2021, no pet.) (mem. op.). A parent's conduct in the

---

[5]Although the trial court also found that Mother had failed to comply with a court order mandating actions necessary for Susan to be returned, we do not address that ground—discussed in Mother's third issue—because the evidence of endangerment is sufficient. *See* Tex. R. App. 47.1; *In re N.G.*, 577 S.W.3d 230, 235, 237 (Tex. 2019) (holding that when a parent challenges a Subsection (D) or (E) finding, due process and due course of law demand that we address the finding and detail our analysis).

home—such as illegal drug use or drug-related criminal activity—can create an environment that endangers a child's physical and emotional well-being. *Id.*

Under Subsection 161.001(b)(1)(E), we ask whether evidence shows that the parent's conduct directly resulted in the child's endangerment. *Id.* The behavior must constitute a voluntary, deliberate, and conscious course of conduct. *Id.* But that conduct need not be directed at the child, and we may infer the specific danger to the child's well-being from the parental misconduct alone. *Id.* "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). And evidence probative of a Subsection (b)(1) ground may also be probative of best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). In reviewing best-interest evidence, we consider nonexclusive factors that the factfinder may apply:

- the child's desires;

- the child's current and future emotional and physical needs;

- the current and future emotional and physical danger to the child;

- the parenting abilities of those seeking custody and programs available to assist them;

- the parties' plans for the child, including the stability of the proposed home or placement;

- the parent's acts or omissions suggesting that the existing parent–child relationship is inappropriate; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

To determine whether the evidence supporting termination is legally sufficient, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

In determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship, we must perform "an exacting review of the entire record," *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014), to decide whether a factfinder could reasonably form a firm conviction or belief that the Department

8

proved the applicable conduct grounds and that terminating the parent–child relationship would be in the child's best interest, Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

For both types of review, we must remember that the factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

## C. Evidentiary review

Understanding how Susan's behavior changed after being in the Department's care is key to understanding how Mother endangered Susan; we thus examine the evidence as it unfolded to the Department, beginning with the referral. We also include details from Mother's and Susan's medical records. And because the endangerment and best-interest facts are interwoven, we review them together.

### 1. Susan

#### a. Houston hospitalization and CPS referral

The Department proffered Susan's neuropsychiatrist's affidavit into evidence.[6] That doctor explained that a UT Southwestern pediatric neurologist had referred Susan to the Houston hospital in early 2019 because even though Susan's brain

---

[6]It had also attached the affidavit to its removal petition, along with the caseworker's affidavit.

imaging and EEG were normal, she "continued to be aggressive, defiant, hyperactive, paranoid, and . . . with manic features," despite her repeated hospitalizations and treatment with multiple medications. According to the UT Southwestern neurologist, Mother and Susan had exhausted all local resources, and Susan would "benefit from a facility that specializes in cognitive and behavioral recovery."[7]

Susan's intake evaluation noted that in the preceding nine months, she had endured seven inpatient hospitalizations and had attended two outpatient partial hospitalizations for "severe behavorial dyscontrol." Susan was taking Depakote, Seroquel, and clonidine.[8] Although all three were "continued" at the Houston hospital, Mother later accused the hospital staff of initiating the medicines to Susan's detriment.[9]

---

[7]In an attached memo, the referring neurologist noted that Susan had been seen in that office "for concussion and traumatic brain injury suffered at 3 years of age. Since that time she has had severe and debilitating behavioral issues. These are *presumably* secondary to TBI." [Emphasis added.]

[8]Depakote and Seroquel are mood stabilizers. *In re J.P.-L.*, 592 S.W.3d 559, 569 (Tex. App.—Fort Worth 2019, pet. denied) (Depakote); *In re D.S.*, No. 02-15-00350-CV, 2016 WL 1267808, at *5 (Tex. App.—Fort Worth Mar. 31, 2016, no pet.) (mem. op.) (Seroquel). Clonidine is frequently used to treat ADHD. *In re X.T.S.W.*, No. 13-12-00646-CV, 2013 WL 4336149, at *2 & n.6 (Tex. App.—Corpus Christi–Edinburg Aug. 15, 2013, no pet.) (mem. op.). Doctors also prescribed clonidine to regulate Susan's mood.

[9]According to the neuropsychiatrist, "None of this is true."

Mother reported that Susan had "failed numerous medications." She "described many behavioral issues with . . . impulsivity, insomnia, paranoia[,] and aggression." Susan acted aggressively mostly toward Mother.

According to the neuropsychiatrist, "It was also reported that [Susan] had total insomnia for 3 days at a time and that no local psychiatrists were willing to continue to see her given the patient's behavior and the mother[']s noncompliance." But the affidavit does not say who reported these things.

In the rest of the affidavit, the neuropsychiatrist described how Mother had disrupted Susan's treatment, stating generally that "[t]he course of [the] hospitalization ha[d] been extremely compromised by the mother's non-compliance with recommendations and inconsistent agreement with her master treatment plan." For instance, Mother had "been very scattered in her thinking" and was "unable to accept any responsibility for her own behavior and parenting skills" that had exacerbated Susan's condition. She had also "alienat[ed] previous treaters to the point that they would no longer see" Susan.

The neuropsychiatrist went on to explain that although hospital staff had "clearly informed" Mother about Susan's master treatment plan and the "attempts to maximize the efficacy of the medications that had been tried prior to her admission at very low doses," Mother denied that Susan had been taking those medications before being admitted. He described the hospital staff's frustration with Mother: "My staff have spoke[n] with the mother on numerous occasions and receive[d] conflicting

11

messages from her during every conversation." Nevertheless, Mother had "continued to give informed consent to all of the medications that [Susan] was being treated with." After Mother "impulsively and abruptly informed [the hospital] that she was taking [Susan] . . . and moving to Kansas," Mother "elected not to move and created further chaos in her daughter's care."

On May 31, 2019, Mother called the hospital staff at 3:00 a.m., demanded that Susan be taken off Seroquel, and "removed her informed consent to administer it."[10] She then threatened legal action if the neuropsychiatrist did not call her back. The doctor did so but recorded the call "so that she could not further distort what I had said to her." The hospital gave CPS a copy of the transcribed recording.[11] The neuropsychiatrist told Mother that Susan would have to be discharged that day because of Mother's "impulsive disruption of care," but Mother refused to come get her at that time. According to the doctor, Mother refused "despite her fears that we were attempting to 'kill her daughter,'" a claim that Mother had posted on the internet.

That same morning, the doctor photographed Susan and sent the photographs—"showing the patient to be of excellent health"—to Susan's CPS caseworker.

_____

[10]The hospital staff thought Mother was intoxicated during that call.

[11]The transcription is not in the appellate record.

12

The doctor summarized his fears about Mother's parenting, noting that Mother had been irresponsible about making appointments with the hospital psychologist and concluding that Mother did not have the capacity "to safely take care of" Susan. The treating team and Susan's CPS caseworker agreed that Susan "would be best served with placement outside of her home or with her grandparents." The doctor opined that Susan "would be at risk for further psychiatric decompensation [and] potential[] maltreatment" if she were returned to Mother's care. The doctor also thought that Susan's impulsivity could "place her at risk in the environment[,] particularly if she [were] not treated with any medications."

Because of CPS's involvement, Susan's neuropsychiatrist did not discharge her until mid July 2019.

**b. Houston hospital records–intake**

The hospital records provide more detail about Susan's intake evaluation.

They note that Susan's "[f]amily medical and psychiatric history includes ADHD, depression, anxiety[], panic attacks, and alcohol/drug use on the maternal side." Mother also reported that Susan's "biological father has bipolar disorder with severe rages . . . and [that he] use[s] alcohol/drugs."

Mother reported that Susan had become a different child since her "TBI with occipital fracture": "Mom reports pupils have been dilated since accident. MRI completed 3 years ago reported a cyst." But "[r]ecent MRI of the brain has shown [Susan's] brain structure to be normal with borderline Chiari malformation with

13

tonsillar ectopia. *There is no evidence of prior injury*, although this does not exclude the possibility of injury 5 years ago." [Emphasis added.] Thus, the "[n]eurologist suspect[ed] her primary issues [were] psychiatric." Mother reported dissatisfaction with Susan's medication even then: "Mom has found that stimulants have been non effective and has been displeased with side effects of anti-psychotics."

The notes show that Mother was concerned about Susan's "frequent temper tantrums when denied her way, significant aggression (e.g., scratching, hitting, throwing items), and engaging in manipulation to get her way (e.g., 'I won't do it unless you do something for me'[])." Mother reported that Susan had "longstanding difficulties" with defying adults and refusing to comply with their directions, both at home and at school. According to Mother, reward systems were ineffective, and Susan wanted only her iPad.

Also according to Mother, Susan blamed others for her own behavior, bullied and threatened to get her own way, experienced significant mood swings, was insecure about her weight, and seemed preoccupied with negative topics such as death and natural disasters. Susan "alternat[ed] between sleeping too much during the day, [which Mother] attributed to medications, and staying up until 3 AM." Mother said these insomniac episodes could last up to a week. Susan had nightmares and frequent fears that prevented her from participating in previously enjoyed activities, and she pulled out her hair when stressed. But according to Mother, Susan was also "hungry all the time" and engaged in unsafe behaviors to "pursue preferred foods."

14

Mother "reported that [c]lonidine, Depakote, and a low dose of Focalin[12] were the most successful in addressing" Susan's behavior. But Mother also noted that frequently Susan would "go between being overmedicated and sleepy to being 'out of control' and hyperactive."

Susan had participated in play therapy with limited success. Susan's former treatment providers had also recommended parent-management training and parent-interaction therapy, but Mother had "not been able" to follow through on those referrals "due to [Susan's] behavioral concerns."

Hospital staff saw Susan throw a temper tantrum in response to staff limits and when interacting with another child, but she settled down when redirected by staff. She also showed hyperactivity and impulsivity, spoke rapidly, and had problems with emotional control.

The consulting psychologist wrote that Susan had experienced "multiple stressors[,] including frequent changes in housing, ongoing custody disputes, and conflict with her mother."[13] She opined, "While some of these concerns have been attributed to [Susan's] remote head injury, it is more likely that this level of dysregulation and concern is due to a combination of underlying psychiatric and

---

[12]Focalin is used to treat ADHD.

[13]A neuropsychologic evaluation noted that Susan's "childhood ha[d] been marked by chaotic family relationships, divorce, multiple moves, witnessing of domestic violence, caregiver substance abuse[,] and personal/family member mental health issues."

environmental factors." The psychologist summarized the hospital's care plan: "Psychologist will provide [Mother] with psychoeducation regarding information contained in [Susan's] records and consultation with her treating physicians that suggests [Susan's] injury was likely a mild brain injury and thus the extent of her behavioral and emotional dysregulation is more likely related to underlying mental health diagnoses." The psychologist recommended parent training to Mother, a structured schedule, and ongoing medication adjustments.

### c. Brain injury

The hospital's records contain more background about Susan's head injury, obtained from Mother and the hospital psychologist's review of Texas Health Denton's records, and which the psychologist described as "a mild head injury at age 3 due to a fall from a picnic table." After falling, Susan vomited on the way to Texas Health and attempted to fall asleep but did not lose consciousness. "On arrival . . . she was noted to have a headache and a left occipital hematoma, with tenderness. No deficits or focal neurological signs were noted." Susan "was described as active and playful." A CT scan showed "a nondisplaced fracture of the left occipital bone, with overlying scalp hematoma" but "[n]o evidence of acute intracranial hemorrhage."[14]

---

[14]Mother testified at trial that after the fall, Susan's speech was rapid, but she "seemed okay" until they got home and she started having headaches. According to Mother, even though a 2015 EEG taken about two years after Susan's injury was normal, "the fracture . . . still showed up with swelling, with tonsillar ectopia[, and with] slight Chiari malformations." According to Mother, the recommended treatment was play therapy.

16

Texas Health transferred Susan to Cook Children's Medical Center, but "per [Mother] she was discharged home that evening with no additional recommendations."

When Susan was seven, she had a "brief neuropsychological evaluation" at Cook Children's that showed "significant concerns with respect to attention and executive functioning." Susan was diagnosed with ADHD and disruptive mood dysregulation disorder (DMDD), "and it was recommended that she be monitored for Oppositional Defiant Disorder, Bipolar Disorder, Acute Stress Disorder/Post-Traumatic Stress Disorder, and Neurocognitive Disorder."

The Houston hospital staff tried to tell Mother that Susan's head injury was not likely the sole cause of Susan's behavioral difficulties and to help Mother understand "the importance of addressing [Susan's] behaviors as likely related to psychiatric diagnoses (ADHD, DMDD) and difficulties in the environment that may lead to [Susan's] behaviors being inadvertently reinforced." Mother appeared defensive at times "and repeatedly stated that she felt [Susan's] behaviors only emerged after her injury and that [they] must be related." Mother did not understand "the importance of recognizing positive behaviors in [Susan] and specifically praising them as a way to redirect attention from only negative behaviors to positive."

### d. Behavior during hospital stay

Susan's sleep problems improved when staff restricted her iPad use and put her on a more structured schedule. The psychologist recommended that restricting Susan's electronics use "be a key part" of her treatment plan upon release. The

psychologist also noted that Susan's hyperactivity and impulsivity had decreased, possibly because of medication changes.

Susan was cooperative with staff and the hospital's structure. But when Mother visited, Susan was disrespectful and intrusive and made numerous requests and demands of Mother. Mother had a hard time redirecting Susan to remain on task.

In April 2019, when Susan had a meltdown and needed sedation, Mother expressed concern about Susan's medication and again attributed the behavior to Susan's head injury. At a team consultation in April, Mother "continued to ask questions regarding [Susan's] diagnoses and whether her history of head injury was responsible for her current behavioral difficulties." Susan stated during a counseling session that she manipulated Mother to get what she wanted and that her brain injury was the reason for her behavior.

Testing and observations showed that Susan had "superior intellectual functioning" but that she also showed various behavioral disorders "associated with frontal systems deficits." Susan still had problems in Mother's presence or when stressed by challenging circumstances.

### e. CPS investigation

Susan's caseworker testified that while Susan was in the Houston hospital, her behavior was "up and down": she was sometimes manic, and she could move from calm to defiant. Although Mother consistently claimed that Susan was aggressive and out of control, no one else had problems with Susan's being aggressive.

Mother would attend medical-team meetings, but she "wasn't quite coherent" and "would be yelling." Hospital staff were concerned Mother was "under the influence of something" during these meetings. Mother would not agree to recommended medication changes or take recommended parenting classes.

Although Susan was on Medicaid—and thus Mother incurred "no charges" for Susan's medical care—Mother had created gofundme pages seeking money to help pay Susan's medical expenses. According to the caseworker, the diagnoses Mother posted on those pages—including that Susan had diabetes—were false.

The caseworker learned that CPS had investigated Mother in the past:

(1) in March 2016[15] for neglectful supervision, which it ruled "unable to determine";[16]

(2) in July 2016 when Susan was hit during a physical altercation between Mother and Maternal Grandmother, which CPS also ruled "unable to determine" because it wasn't clear who hit Susan or how the fight happened;[17] and

(3) twice in 2018, both of which CPS "ruled out."[18]

---

[15]Susan was five at the time.

[16]Unable to determine means that the Department could not prove the allegation true or false. *Jacquot v. Coker*, No. 14-20-00123-CV, 2021 WL 6050068, at *1 (Tex. App.—Houston [14th Dist.] Dec. 21, 2021, no pet. h.) (mem. op.).

[17]Maternal Grandmother admitted that she and Mother had gotten into several altercations but only one physical altercation. According to Maternal Grandmother, she had grabbed her cell phone from Mother and accidentally hit Susan in the process.

19

According to the caseworker, every time Susan had been in a treatment facility and was then discharged to Mother with "very specific instructions regarding [Susan's] medications," "there [was] a concern" that Mother did not consistently administer the medications and that Mother was taking them herself. Mother would wait until Susan was "on [a] medication" to complain about her being administered that medication.

**f. 2018, early 2019 hospitalization records**

The trial court admitted detailed records from five of Susan's pre-Houston hospital stays.

In May 2018, Susan was admitted to a psychiatric facility for inpatient treatment. Mother had been living at Safe Haven and when she took Susan there, Susan threw a chair and almost hit another child. Susan reported hearing voices in her head that told her to hurt others and throw things. She was prescribed clonidine, Risperidal,[19] and melatonin.

Mother told the therapist that Susan's outbursts had been getting worse and more difficult to control. She also reported that Susan's pupils dilated often but that

---

[18]Ruled out means that the Department reasonably concluded that the alleged abuse or neglect did not occur. *In re M.A.J.*, 612 S.W.3d 398, 413 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g).

[19]"Risperdal (Risperidone) is a psychotropic mood stabilizer used to relieve or improve symptoms such as hallucinations, irrational beliefs and fears, disorganized thinking, severe anxiety, apathy, emotional withdrawal, social withdrawal, and mood swings." *In re L.M.F.*, No. 02-13-00459-CV, 2014 WL 2465137, at *2 n.5 (Tex. App.—Fort Worth May 29, 2014, no pet.) (per curiam) (mem. op.).

Susan had "had scans done and they did not find any bleeds." Mother said that the doctors at Cook Children's "want[ed] to start testing over" and that Susan had an appointment at Cook Children's but that she wanted Susan to see a different psychiatrist because Susan's did not pay attention.

The therapist thought Mother was hyperfocused on Susan's "not being able [to] 'do well in school.'" She also thought Mother was "supportive but overwhelmed" and unsure about the availability of resources to help Susan.

Susan improved her behavior and after a week was discharged to a partial hospital program that she was to attend while living with "[f]amily." Susan continued to experience anxiety and agitation, eventually renewing her aggressive outbursts and object-throwing. After two weeks, she failed to return and was discharged. Mother told the facility that she had decreased Susan's Risperidal on her own.

Susan was admitted to the same facility in September 2018. She had continued to act aggressively toward Mother and was hyperactive, even after taking her clonidine; was making suicidal threats; and reported "feeling overwhelmed with stressors." She also admitted that she hurt Mother when angry. Mother reported that Susan was allergic to Risperdal and that Mother had gotten results from Susan's neurologists indicating that Susan's cerebellum was descended.

Once again, Susan improved slowly—"able to refrain [from] further aggressive outbursts, but still somewhat hyperactive as well as [prone to] negative attention-

seeking . . . behaviors." She was prescribed clonidine, Focalin, Depakote, and Vistaril.[20]

At one of the therapy sessions, Mother said that Susan had "cracked [her occipital bone] in half" when she had fallen from the picnic table and that she hadn't been the same child since, attributing Susan's inability to focus to the old injury. Mother told the therapist Susan's prescribed medication did not appear to be working and asked if Susan was old enough to use Gabapentin.[21]

The hospital discharged Susan before the end of two weeks. Although the facility noted that Susan's history was "significant for a need to rule out seizure disorder as well as . . . migraine headaches," it also noted that staff had monitored Susan's "[m]edical status" throughout her stay and found "no acute physical distress."

When Susan was again admitted in November 2018, she had reportedly threatened to kill herself with scissors and feared "people breaking into her home." She had impaired mood and daily functioning, was unable to control her mood swings and anger, and "was identifying homicidal thoughts towards" Mother. A doctor prescribed clonidine and Depakote.

---

[20]Vistaril is a sedative used to treat anxiety. *Cunningham v. Haroona*, 382 S.W.3d 492, 499, 513 n.20 (Tex. App.—Fort Worth 2012, pet. denied).

[21]Gabapentin is an antiseizure medication. *See Clair v. State*, No. 2-03-507-CR, 2006 WL 496035, at *1 (Tex. App.—Fort Worth Mar. 2, 2006, no pet.) (mem. op., not designated for publication).

During a session, Mother told the therapist that nothing triggered Susan and nothing was wrong, "just like nothing makes her eye di[]late." Mother told the therapist that clonidine "is the only thing that seems to calm her down." She acknowledged Susan's needs but denied the hospital treatment's effectiveness: "I know she needs help[,] but I know y[']all can[']t help her[,] and the medication is not going to help her[;] she needs[a] neuro program."

The therapist again described Mother as supportive but overwhelmed. She thought Mother was hyperfocused on Susan's potential neurological problems rather than Susan's behavior and mental health.

Susan slowly improved her behavioral control and in a little over two weeks was able to be discharged to outpatient status. Notes from one session showed that Susan was compliant with her medications and tolerated them well; they also noted that Susan was pleasant and bright.

Finally, Mother took Susan to the same hospital in early February 2019, again for aggression toward Mother and hyperactivity. Susan reportedly was staying up all night and sleeping all day, and she had not been able to start school. Susan also reported hallucinating.

During therapy, Mother reported Susan's behavior had not improved, even after hospitalization, and that doctors were unwilling to prescribe certain medications. The therapist opined that Susan was making progress but still had work to do. Susan's discharge summary details the hospital staff's efforts to work with Susan on her

behavior and observes, "Mother was focused on history of traumatic brain injury, to the point that she wanted medications that were not clinically indicated."

Once again, Susan slowly improved her behavior, and the hospital discharged Susan before the end of two weeks.

### g. Post-removal improvement

Rebecca Duncan, a Denton County CASA supervisor, had been assigned to Susan's case since July 2019. She met Susan when she was still in the Houston children's hospital. According to Duncan, Susan had "always been very active," "[a] little bit hyper," "generally very sweet[,] and very, very, very smart." Although Duncan thought Susan was still "fundamentally herself" since coming into the Department's care, she was more stable—including with her medications[22]—and her social skills had improved.

Susan had been receiving behavioral therapy from the same counselor since September 2019 and was seeing a psychiatrist monthly. Susan had been diagnosed with DMDD, ADHD, and depression without psychotic features. According to Duncan, Susan had experienced "occasional headaches," but Duncan did not know of any sleep problems, psychosis, or psychotic incidents. Duncan testified that Susan's diagnoses are all psychological. When asked whether, "[t]hroughout the pendency of

---

[22]One of those medications was risperidone, which Mother claimed Susan was allergic to. She had been taken off risperidone for a brief time around Christmas 2020, but "[h]er behaviors escalated, and she started having some problems with aggression."

[the] case," Susan had "been diagnosed with or . . . had to [have] been treated for any issues that have resulted from that traumatic brain injury," she answered no.

Duncan explained that Susan's placement with Maternal Grandfather did not work out because Susan "had a lot of therapies and a lot of needs," which strained his marriage; "[t]hey didn't have the time to devote to it[, and] [t]hey couldn't handle her ADHD."

Susan's therapeutic foster home was licensed for children with care needs above a basic level; the parents could handle children with moderate or specialized behaviors. There, Susan had shown progress in her behaviors and had been moved to a moderate care level. Duncan thought the home had been appropriate for Susan and was giving her the care she needed.

Although Susan had not made any outcry to Duncan about abuse or neglect at the home, Mother and Maternal Grandmother testified that Susan's roommate stole and broke her belongings; Susan also told the conservatorship worker about the problem. Susan was also allowed to watch an R-rated movie, a problem the Department addressed with the home.

Susan's counselor thought Susan had matured and progressed. She had only seen Susan being hyperactive and exhibiting ADHD-like behaviors. She had not seen any paranoia or mania, nor had she heard Susan engage in suicidal ideation. The counselor thought living in the therapeutic foster home had been "very" good for

Susan because she was more stable emotionally, had better social skills, and was better able to use coping skills, identify her emotions, and follow directions.

Susan also told the counselor that she hadn't meant to threaten her half-sister. "[S]he didn't know what she was doing. And she was very apologetic and upset that it happened." Susan was able to apologize, which she had struggled to do in the past.

The counselor watched only one visit between Susan and Mother, the first one since the trial court had suspended visitation.[23] She thought Mother was appropriate during that visit and that the visit was "normal"; they were excited to see each other.

The counselor had spoken with Mother once, on a September 2020 permanency call in which Mother accused her of traumatizing Susan.

**h. Endangerment opinions**

The caseworker agreed that Susan had "some behavioral issues" but also said that although Mother "was attempting to get her daughter help[, she] would not follow the recommendations of the medical professionals." The Department believed Mother was endangering Susan by ignoring her medical providers' recommendations. The Department's concern was based on (a) the medical professionals' reports that "the symptoms that [Mother] was describing [weren't] happening" and that "maybe those symptoms were exaggerated" and Susan just had ADHD or defiance disorder

---

[23]Shortly before trial, the counselor had recommended that Susan be able to visit with Mother again because Susan "was stable and was not having any behavioral outbursts."

and (b) Mother's false "Internet page and outcry about [Susan's] health and needing the money."

CASA agreed: "[N]ine hospitalizations in the ten months prior to her removal was incredibly damaging to [Susan]. Not being able to go to school was damaging to [Susan]. Because she was spending so much time in the hospital, she couldn't go to school." Duncan believed Susan's trauma had occurred while in Mother's care because Susan's medical records and Duncan's own observations showed that Susan's behaviors escalated when near Mother, resulting in Susan's repeated hospitalization.

Susan's counselor believed that Susan had experienced trauma from Mother. She thought being returned to Mother would endanger Susan's wellbeing because it would affect her stability. Although the counselor admitted that being moved from the therapeutic foster home, as well as having Mother's rights terminated, could also be traumatic for Susan, she didn't think Susan's stability would be threatened if her move from the therapeutic foster home was to her final placement.

The caseworker admitted that Mother had never officially been diagnosed with Munchausen's by proxy and that Mother appeared to be a concerned and proactive parent when talking with the caseworker.

## 2. Mother

### a. Substance abuse and pre-removal background

Mother testified about her background as well as about post-removal events. Importantly, the trial court had ample opportunity to observe Mother in court.

Mother's medical records show a history of alcohol and substance abuse in the years after Susan's birth. Mother went to alcohol rehab at least three times. During one of those times, Susan lived with Maternal Grandfather and his wife.

Mother sought treatment for "excessive alcoholism" several times in 2017 because she "had a lot of trouble . . . that year." Her medical records from one hospital visit show that she reported drinking 42 beers per week and using marijuana and clonazepam; she would overuse the clonazepam to mitigate alcohol-withdrawal symptoms—including hallucinations—and vice versa. Mother was hospitalized at least twice due to her alcohol misuse, and during those times, she sent Susan to live with Maternal Grandmother. Mother also went to a psychiatric facility in 2018 and was "essentially homeless."

Mother was convicted of driving while intoxicated in 2016.[24] And in 2018—a little over a month before Susan's May 2018 hospitalization—Mother criminally trespassed at Maternal Grandmother's house while intoxicated. Mother successfully

---

[24]Also in 2016 police arrested Mother for allegedly assaulting Maternal Grandmother while Mother was intoxicated. But Mother was never prosecuted.

completed her deferred-adjudication probation for the trespassing; while on probation for that offense between April 2018 and May 2019, all her UAs were negative.

### b. Mental-health diagnoses

In addition to her alcohol and substance abuse, Mother suffered from PTSD, depression, and anxiety disorder. She had a history of panic attacks, took various medications, and was under a psychiatrist's care. Mother claimed at trial that she had been "stable on [her] medications" since early 2021.

### c. View of Susan's health problems

Mother claimed that she first took Susan to a mental-health facility on Susan's counselors' recommendation because they noticed that, while at Safe Haven, Susan was "throwing her shoes across the lunchroom" and scratching Mother. Mother testified that after Susan began taking risperidone in 2018, she "immediately started having paranoia" and wouldn't eat or drink unless Mother first took a bite or a drink. Mother claimed that no doctor had prescribed Susan Depakote or clonidine until a neurologist did so in 2019.

Mother denied that Susan's doctors "did not believe that [her] behavioral issues stemmed from the [head] injury" and that she had been "told multiple times that [Susan] did not have any remaining issues stemming from her brain injury." Mother said she took Susan to doctors to try to get a diagnosis and to control Susan's behaviors: "I was just trying to figure out what was wrong with her." But she was concerned that the doctors had overmedicated Susan:

29

They had her on Lithium. They had her on Depakote. They had her on clonidine. They had her on Metformin because she gained too much weight from the Seroquel. Seroquel was another one.

They had her on Fluoxetine. They had her on Ativan shots. They had her on a cocktail shot which I called the ambulance on because the nurse hung up on me when [Susan] called me screaming that she couldn't move her legs.

**d. Post-removal criminal behavior, substance abuse, and instability**

In September 2019, a Dallas trial court placed Mother on four years' deferred-adjudication community supervision for a July 2019 felony harassment of a public servant. In February 2020, while Susan was living with Maternal Grandfather, police arrested Mother for family-violence assault against Maternal Grandmother, with whom Mother was living. Although Maternal Grandmother refused to press charges, the State filed a petition to adjudicate in Mother's criminal-harassment case, based on the alleged assault.

In October 2020, Mother was arrested in Collin County for allegedly choking a man she was either dating or rooming with. According to the police report, that man's sister told the 911 dispatcher that Mother was beating up her brother and that "when [she] drinks she beats him up"; the dispatcher could hear a female yelling in the background. The complainant (Roommate) had also told his sister that he had been strangled.

The responding officer saw signs of a fight, and Mother admitted knocking a protein shake out of Roommate's hand. Roommate—who was partially paralyzed and

30

in a wheelchair—told the officer, "[T]his is a normal conversation with her getting very angry and hitting [me] with open and closed fists along with kicking and choking." Roommate said Mother hit him on the face with an open hand and then choked him and said she wished he would die; he could not breathe and "saw stars." Roommate added that Mother was verbally and physically abusive every day and had—when "very emotional"—"strangled him multiple times."

A trial judge issued a protective order against Mother, and in the criminal-harassment case, the State amended its then-pending adjudication petition to allege this new assault. During the termination trial, Mother denied choking Roommate but took the Fifth to many questions because the charge was still pending.

After Mother's incarceration from October to December 2020, she lived in a sober-living house and then an extended-stay motel. She had a sponsor at the sober-living house but could not remember her sponsor's name; Mother stayed there only a week and a half because she claimed to have contracted COVID-19.[25]

Mother claimed to have been sober since January 2021. But she admitted that she had started drinking again before that. Although Mother denied going to the

---

[25]Mother's probation officer was not so convinced: "It is concerning to note that [Mother] has either left or has been forced out of [a] sober transitional living home . . . and has been residing at a hotel since. During [Mother's] stay at the Freeman House, . . . the Intake Coordinator [told the officer] that [Mother] was exhibiting 'behavioral issues' at the home." The Intake Coordinator also told the probation officer that she did not believe Mother was ready for transitional housing. According to the probation officer, Mother had been saying she would check into the hospital but had not done so until called in for a drug test.

hospital in January 2021 for alcohol intoxication—she claimed to have had "encephalopathy on [her] brain"—hospital records show that she was admitted that month "with alcohol abuse and delirium tremens." She had gone to the ER for "multiple falls," "multiple contusions," and leg weakness, but her blood-alcohol level was abnormal, and the doctor suspected that "her weakness and her falls [were] truly more related to alcohol use than anything else."

Mother started attending AA meetings in February 2021 and went about 20 times. But she stopped going to AA when she started individual counseling. Mother had participated in AA once before but never completed it successfully. Other than her sobriety for the few months before trial, the longest Mother had ever maintained her sobriety was from 2006 to 2013.

Mother claimed to be working "the steps" of a 12-step program but was still on Step 1. At the time of trial, she would admit only that she had a past problem.

In early February 2021, Mother checked herself into a psychiatric facility for 12 days to try to get back on her medications. She then went to another extended-stay motel for a couple of months and finally "rented a room" from a couple whose names she could not remember. After a few months, she moved in with her boyfriend, Jeff, whom she had dated for three months but known for three years. She married Jeff in June 2021, but he died in an accident seven days later.

### e. Post-removal psychiatric records

Mother's psychiatric records showed a pattern of denial and blame shifting. She told her psychiatrist in July 2021, "[T]here is . . . absolutely no reason I should not get [Susan] back" from foster care. She said that Susan had been hospitalized for her head injury. Mother also blamed her troubles on Maternal Grandfather and his wife, as well as Stepfather, who she claimed was "trying to get custody of" Susan. Mother denied having a substance-abuse problem or needing substance-abuse counseling. Although Mother reported chronic homelessness and money trouble, she also told her psychiatrist that she had undergone laser surgery on her eyes "to tighten [the] skin."

### f. Services completed

Mother had two psychological evaluations and had attended twenty-four individual counseling sessions; she was still in counseling to address grief issues due to the termination case and past substance abuse. But Mother said her therapist had not recommended substance-abuse-specific counseling. Instead, Mother had completed supportive outpatient treatment (SOP).

Mother had taken a women's wellness course. She was taking care of herself, seeing a psychiatrist, and taking her medications. Mother took a Love and Logic parenting class in December 2019, in which she learned to respond to Susan with "kindness and sadness"—"to divert her to do what she needs to do. But to approach it in a different way. And that is with love and empathy." Mother had also completed an anger-management course and said she was applying those skills in her life.

Mother believed that CPS had not adequately communicated with her and had denied her court-ordered communication, input, and involvement.

### 3. Additional best-interest evidence and opinions

Mother had three other children, but she had not seen two of them since 2018. Susan told her counselor and CASA that she did not want to live with Mother because she was afraid of getting sent back to hospitals and she believed that would happen in Mother's care. Susan wanted to live with Stepfather or with relatives.

Mother was concerned about Susan's placement in the therapeutic home. She thought it was in Susan's best interest to be returned to her care "[b]ecause she would have a stable home."

Neither CASA nor the Department thought the therapeutic home was an ideal or long-term solution. Duncan, the CASA supervisor, admitted that therapeutic homes generally are not adoption motivated and that if Mother's rights were to be terminated, Susan would have to be moved at least once again to an adoption-motivated home. But Duncan was optimistic that a long-term placement could be found for Susan and that "there is the right family out there for her."

The Department's permanency plan was for long-term placement, and the Department was still considering family although it had not identified a specific family member. Trying to find a relative placement for Susan had been difficult because "having [Susan] would cause them to have to deal with [Mother], and they [didn't] want to."

Throughout the case, Mother was chronically unemployed, which she blamed on Susan's health-care needs and, alternatively, her own mental-health problems. Although Mother had a job by the time of trial, her first day at that job was eight days before trial. Mother said she planned to continue working there long-term.

Mother was living in Jeff's home at the time of trial, but he had not bequeathed it to her, nor was her name on the title. Nevertheless, Mother opined that Susan would live in the house with her. Mother had an attorney—paid for by Maternal Grandmother—for Jeff's probate case, which she expected to be tried in October 2021.

If she could not stay in Jeff's home, Mother planned to live in an apartment but admitted that she had not saved money for that purpose. When asked how she could afford to take care of Susan, she said, "I will own a home" because "my husband does." If she were convicted of her then-pending charges, Mother planned for Susan to live with Maternal Grandmother.

Mother believed she could meet all of Susan's medical needs. She had identified a psychiatrist for Susan and planned to do family therapy. Mother also claimed to have a support system: Maternal Grandmother, her work friend who had also been to rehab with her and was also in recovery, and her church.

Neither the Department nor CASA thought that Mother had changed her behavior sufficiently. For example, Mother had not complied with the requirement that she refrain from alcohol use and criminal activity. Also, Mother "continue[d]

to . . . want[] to be the doctor in [Susan's] medical care instead of listening to professionals." Mother was not "entirely truthful" with health care providers, leading Susan to miss out on necessary care. Finally, Mother had downplayed the extent of her substance abuse, did not have a sponsor, and was not truthful in her psychological assessment.

The Department conservatorship worker thought that although Mother was showing stability or consistency at the time of trial, she had not shown it to the extent that Susan should be returned. Neither the Department nor CASA had been able to see Jeff's home[26]—which Mother had been living in only a short time. The Department was also concerned about Susan's emotional wellbeing were she to be returned to Mother: "[T]he Department has not seen [Mother] being able to handle [Susan's] emotions. We have seen [Susan] wanting to run the show [during] visitation. So we haven't seen [Mother] being able to fully be the parent to" Susan. Specifically, the conservatorship worker thought that with Mother Susan would still be at risk of continually "going into hospitals."

Duncan believed that because of the trauma Susan had experienced, the most important thing for her would be stability and predictability. Duncan explained that because of Susan's trauma history, keeping her safe was not enough: "Their fear response has been so activated so many times that you have to help them -- help them

---

[26]When CASA tried to do a home visit with Mother the week before trial, Mother refused to have a conversation with Duncan or let her in the home. Mother said she had to go to work.

regulate, help them calm that fear response down. And you do that through those predictable routines and structure that helps them feel the safety that they're receiving." Thus, she explained, a child who has experienced trauma needs more than simply a stable environment.

She also thought that the services Mother had completed had been recommended based on incomplete, untrue, or unreliable information from Mother herself.[27] For example, Duncan did not think SOP sufficiently addressed Mother's alcoholism. She was also concerned that although Mother had completed "her psychosocial multiple times," SOP, and anger-management classes, she was still getting arrested, exhibiting assaultive behaviors, and relapsing.

Mother thought it would be traumatic for Susan if Mother's rights were terminated. Duncan agreed but opined that "the trauma [of] going back to that family outweighs that."

The Department did not dispute that Susan was bonded with Mother and Maternal Grandmother. Nevertheless, it did not recommend Maternal Grandmother as a placement because Maternal Grandmother had once stated she would not be able

---

[27]One of Duncan's biggest concerns was Mother's inability to be truthful. Duncan knew that Mother had reported in one of her psychological evaluations that she was not seeing anyone at the time that she had been seeing Jeff. Although Mother had "been connected to men" while the case was pending, CASA staff was surprised to learn that Mother had married.

to be protective of Susan.[28] Maternal Grandmother had "frequently changed her positions in [the] case," depending on her relationship with Mother at the time. The conservatorship worker thought that if faced with protecting Mother or Susan, Maternal Grandmother would pick Mother. Moreover, during a visit with Susan, Maternal Grandmother told Susan to tell the Department that she wanted to live with Maternal Grandmother. But Maternal Grandmother denied doing so.

Likewise, CASA was concerned that Maternal Grandmother would not be protective enough of Susan based on their tumultuous relationship, Maternal Grandmother's inconsistent support, and Maternal Grandmother's unwillingness to press assault charges against Mother. Thus, CASA did not favor Susan's being placed with her.

Duncan described Mother's attitude as "kind of all over the place": "Sometimes she is happy to talk, but she's always defensive. She makes a lot of excuses." Mother blamed others for the situation—Stepfather, doctors, her stepmother, and CPS—and until trial, Duncan had never heard Mother take accountability for anything. Duncan did not think Mother was being realistic about her current circumstances and the level of care Susan would need.

---

[28]Maternal Grandmother admitted saying this in October 2020, when Mother was in an unstable relationship with Roommate. But she thought that given Mother's situation at the time of trial, she could put Susan's well-being above Mother's. The conservatorship worker also admitted that at a more recent placement hearing, Maternal Grandmother had testified that she could be protective of Susan.

Duncan had watched Mother's visits with Susan, and Susan often took a parental or authoritative role during those visits, which Duncan thought was unfair to Susan.

## D. Analysis

### 1. Mother endangered Susan

Mother argues that the Department's evidence failed to show that she endangered Susan by repeatedly seeking medical treatment for her because that same evidence showed that Susan had real mental-health and behavioral problems and therefore the hospitals were a safe place for her. She accuses the Department of fabricating a medical diagnosis (Munchausen by proxy), removing the child for that reason, and then looking for other reasons to terminate the parent–child relationship.

Not only does this argument grossly mischaracterize the record, it ignores two important aspects of Section 161.001(b)(1): (1) a trial court may consider all circumstances—both before and after removal—in making its termination decision, *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); and (2) subjecting a child to a life of uncertainty and instability can endanger the child, *In re R.W.*, 129 S.W.3d at 739; *see also In re P.W.*, 579 S.W.3d 713, 726–27 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (holding that trial court can consider effect of parent's mental-health problems as endangering to child). And a child's post-removal improvement can be probative. *See In re A.B.V.*, No. 13-18-00457-CV, 2019 WL 613342, at *6 (Tex. App.—Corpus

Christi–Edinburg Feb. 14, 2019, no pet.) (mem. op.); *see also In re J.R.*, 501 S.W.3d 738, 746 (Tex. App.—Waco 2016, no pet.) (improvement also probative of best interest).

Our exhaustive record review amply shows that Mother's conduct subjected Susan to an uncertain and unstable life. No one disputes that Mother, as Susan's parent, had the right to question doctors—and even disagree with them—about Susan's medical treatment. But the problem here is that Mother did so while simultaneously denying the extent of Susan's behavioral and mental-health needs and refusing to engage in parent training or other interventions that would help her learn to manage those needs. Mother failed to take responsibility for her role in Susan's care.

Additionally, Mother's substance abuse and behavior problems—which resulted in chronic unemployment, unstable housing, criminal conduct, and the alienation of her family members—led to Susan's chaotic and unstable home life.

We therefore hold that the evidence is both legally and factually sufficient, under the proper clear-and-convincing standard, to prove that Mother endangered Susan.

## 2. Terminating the relationship was in Susan's best interest

Mother argues that terminating the relationship went against Susan's best interest because of Susan's strong bonds with Mother and Maternal Grandmother, because Mother showed she could adequately meet Susan's needs, and because Susan would be traumatized by the loss of her family and might never have permanency. She

contends that there is "no evidence" that she was anything but "a frustrated, stressed, and distraught parent" who had "changed her behaviors" and "completed all of her services."

Again, this argument mischaracterizes the record. But it also cherry picks evidence rather than viewing it in context.

The trial court did not believe that Mother could meet Susan's needs. In ruling, the trial judge stated that Mother's behavior had gotten worse during the case and that "because of her own issues and her own problems and her own inability to have a stable life and environment, she cannot meet the needs of her own child."

Indeed, the evidence showed that Mother had remained chronically unemployed until right before trial; that she had been sober for only a short time, resisted intensive treatment, and would not admit the extent of her substance-abuse problem; that Mother continued to have a rocky relationship with her parents and others; that she could not maintain stable housing on her own; and that she had two pending felony charges.

Although Susan loved and was bonded to Mother, Susan's behavioral and mental-health issues had improved significantly while not in Mother's care, and Susan did not want to go back to her former life with Mother. The Department did not want to keep Susan in the therapeutic home and was looking for a long-term placement, preferably with a family member who could handle her unique needs. And even though the Department acknowledged that the termination would likely be traumatic

for Susan, the Department thought it would be less traumatic than returning Susan to Mother, where she would be subjected to more instability and ineffectual parenting.

After applying the applicable standards of review, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that terminating the parent–child relationship was in Susan's best interest.

### E. Conclusion

We overrule Mother's first, second, and fourth issues and affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  February 22, 2022